**WEST PENN SAND & GRAVEL CO. et al.
v. NORTON, Deputy Commissioner
(DONNE, Intervener).**

No. 6457.

Circuit Court of Appeals, Third Circuit.

March 18, 1938.

John M. Reed, of Pittsburgh, Pa., for appellants.

Robert E. McCreary, and Bradshaw, McCreary & Reed, all of Beaver, Pa., for intervening defendant.

Charles F. Uhl, U. S. Atty., and John D. Ray, Asst. U. S. Atty., both of Pittsburgh, Pa., for defendant Augustus P. Norton, Deputy Commissioner.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court dismissing the bill of complaint filed by the appellants in which they sought to have set aside an award of compensation made by Deputy Commissioner Norton in favor of Rose Delle Donne for the death of her husband, Joseph Delle Donne.

The only question involved is whether or not the death of Donne arose "out of" his employment within the meaning of section 2(2) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 902(2), which defines "injury" as "accidental injury or death arising out of and in the course of employment."

The appellants have not denied, nor could they deny under the facts of this case, that Donne died "in the course of" his employment, but they do deny that his death arose "out of" his employment.

Donne was employed by the West Penn Sand & Gravel Company, hereinafter called West Penn, as a general utility man. On July 9, 1936, he was engaged in unloading certain equipment from a barge owned by West Penn. The barge, which was a short distance from shore on the Ohio river at Rochester, Pa., was being unloaded by means of a crane located on the bank. The method of unloading the barge was as follows: The arm of the crane would be swung out over the barge. Donne and other employees stationed on the barge would attach to the arm the articles to be unloaded, and the crane arm would then swing the load to shore. Other employees on shore would unload the equipment, and the crane arm would then be swung back to the barge for another load. The testimony indicated that it would take approximately fifteen to twenty seconds for the arm of the crane to swing to shore, be unloaded, and return for another load. During this interval the men on the barge had no active duties to perform other than to be ready to attach another load to the crane. In one of these intervals, Mike Diklich, a friend of Donne's, playfully threatened to throw Donne into the river, and started a friendly scuffle. In the course of this "horseplay" both men fell into the river and were drowned.

The only finding of fact made by the Commissioner, with which the appellants take issue, is that Donne "merely resisted the attack of his co-employee and did not participate in the horseplay." This finding, along with the other findings of fact, was affirmed by the District Court, which said that "the evidence fully justifies the findings of fact made by the Commissioner."

We agree with the District Court. Henry Mays, an employee of West Penn, also stationed on the barge when the accident occurred, testified that he heard Diklich say to Donne, "I'll put you in the river," and that Donne did not reply to this threat, but "just to sort of make resistance. * * *" Mays also gave the following answers to questions put to him at the hearing:

"Q. You say that Joe did resist Mike, trying to keep him from pushing him into the river, is that right? A. Yes, sir.

"Q. This happened so fast you heard these words, Mike trying to push him and Joe resisting, and in the water they went? A. Yes, sir, that's just how it happened."

This testimony fully justifies the above finding of fact.

Upon these facts, the Commissioner concluded that the death of Donne arose "out of and in the course of" his employment, and awarded compensation to Donne's widow.

■ The question of whether or not injuries or deaths resulting from "horseplay" can be said to arise "out of" the employment, has been answered in many cases, of which the following are illustrative. Mascika v. Connecticut Tool & Engineering Co., 109 Conn. 473, 147 A. 11; Lee's Case, 240 Mass. 473, 134 N.E. 268, 20 A.L.R. 870; Leonbruno v. Champlain Silk Mills, 229 N. Y. 470, 128 N.E. 711, 13 A.L.R. 522. See 43 A.L.R. 492. The general rule applied in practically all the cases is that the "horseplay" or "skylarking" must have some causal connection with the employment, but as pointed out in the Mascika Case, supra, the courts stating this rule differ radically in its application, and on substantially the same facts reach opposite results.

■■ When interpreting the meaning of words (in an act of Congress) which may be open to different meanings and applications, it is pertinent to consider the purpose and history of the act. The purpose of Compensation Acts in general, including the Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C.A. § 901 et seq., here involved, is to relieve injured employees and their dependents,

500

who sustain loss as a result of personal injuries and deaths occurring in the course of their employment, by distributing part of such loss to the industries served by such employees and ultimately to the public served by the industries. Baltimore & P. Steamboat Co. v. Norton, 284 U.S. 408, 52 S.Ct. 187, 76 L.Ed. 366; Fidelity & Casualty Co. of New York v. Burris, 61 App. D.C. 228, 59 F.2d 1042; Verschleiser v. Stern & Son, 229 N.Y. 192, 128 N.E. 126, 128.

In order to effect the purpose for which they were enacted, these laws must be liberally construed. Baltimore & P. Steamboat Co. v. Norton, supra.

▆▆ The Longshoremen's Act of March 4, 1927, 44 Stat.1924, followed in the main the Workmen's Compensation Law of the state of New York. "It is familiar law that whenever Congress * * * has borrowed from the statutes of a state provisions which have received in that state a known and settled construction before their enactment by Congress, that construction will be deemed to have been adopted by Congress together with the text which it expounded, and the provisions will be construed as they were understood at the time in the State. Capital Traction Co. v. Hof, 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873; see, also, Henrietta Min. & Mill. Co. v. Gardner, 173 U.S. 123, 19 S.Ct. 327, 43 L. Ed. 637; Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Marlin v. Lewallen, 276 U.S. 58, 48 S.Ct. 248, 72 L.Ed. 467." Hartford Accident & Indemnity Co. v. Hoage, 66 App.D.C. 154, 85 F.2d 411, 413. The interpretation to be given to the words "out of" in the Longshoremen's Act should be the same as that given to them by the Court of Appeals of New York in the case of Leonbruno v. Champlain Silk Mills, supra, and other New York cases decided prior to the enactment of the Longshoremen's Act. In the Leonbruno Case, a workman lost "the better part of the sight of one eye" as a result of having been hit by an apple thrown by a fellow employee in sport. Mr. Justice Cardozo, then on the Court of Appeals of New York, held that this injury arose "out of" the employment. He said that the injured employee's "presence in a factory * * * involved exposure to the risk of injury from the careless acts of those about him. * * * Whatever men and boys will do, when gathered together in such surroundings, at all events if it is something reasonably to be expect-

ed, was one of the perils of his service." He also quoted Mr. Justice Kalish, who, in the case of Hulley v. Moosbrugger, 87 N. J.L. 103, 93 A. 79, said that it was but natural to expect young men and even workmen "of maturer years * * * to joke with or play a prank upon a fellow workman," and "is a matter of common knowledge to every one who employs labor."

In the case of Verschleiser v. Stern & Son, supra, a fellow employee in the abattoir of Joseph Stern & Son, Inc., draped a piece of flesh about two feet long around the neck of the claimant who resented the insult and assault and, in his excitement, believing the attack to have been made by Dudler (a fellow employee) went over to him and struck him several times with the piece of flesh, and then threw it down. Dudler thereupon kicked the claimant, causing the injuries complained of. On these facts the Court of Appeals held that the claimant was not the aggressor.

"He was waiting to 'lug' away viscera, and while waiting * * * was assaulted. In his excitement he defended himself by a counter attack upon, as it seems, another employe, with the resulting injury to himself. He did not initiate the 'mêlée,' but was desirous only of transacting his master's business in peace. * * *

"The man who initiates an assault is doing a willful thing, but this cannot be said of the man who, surprised by physical assault or insult, reacts and in self-protection strikes another. * * *

"It may seem harsh and arbitrary to impose liability upon a master for an assault committed by a workman upon a coworkman, but the purpose and intent of the statute is to fix an arbitrary liability in the greater public interest involved. * * * Liability was imposed regardless of fault —vitally different from that under the common law. * * * The claimant is entitled to the benefit of the act."

It was declared in General Accident, Fire & Life Assur. Corporation v. Crowell, 5 Cir., 76 F.2d 341, 342, that "practically all the cases hold that when the horseplay is initiated by the other employee the injured person may recover."

▆ It is obvious that if we adopt the decisions of the New York courts, the award of compensation in the present case should be sustained. If occasional friendly "horseplay" is a thing to be expected in ordinary

employment, it is a risk which the appellants assumed in the employment.

However, in this case it is not even necessary to adopt the broad doctrine of the New York cases in order to sustain the award here involved. Donne was at his place ·of duty engaged in the furtherance of his employer's interests. He had to retain his position on the barge in order to be ready to reload the crane. It was, therefore, his duty to resist the attempt to throw him into the river and in the words of the Eighth Circuit in the case of Kansas City Fibre Box Co. v. Connell, 5 F.2d 398, 405, 43 A.L.R. 478, by so doing he was "serving his employer by trying to stop interference with his work." His death, therefore, had a definite causal connection with, and arose "out of," his employment.

The decree of the District Court is affirmed.