# MICHAEL G. BLAKESLEE, JR. *v.* PLATT BROTHERS AND COMPANY ET AL.
## (SC 17421)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.*

Argued October 18, 2005—officially released August 1, 2006

* The listing of justices reflects their seniority status on this court at the time of oral argument.

This case originally was argued before a panel of this court consisting of Chief Justice Sullivan and Justices Borden, Norcott, Katz and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Palmer and Vertefeuille were added to the panel, and they have read the record, briefs and transcript of the oral argument.

*James P. Brennan*, for the appellant (plaintiff).

*Jennifer A. Hock*, for the appellees (defendants).

Opinion

BORDEN, J. The plaintiff, Michael G. Blakeslee, Jr., appeals from the decision of the workers' compensation review board (board) affirming the decision of the workers' compensation commissioner for the fifth district (commissioner). The commissioner had dismissed the plaintiff's application for benefits for injuries the plaintiff sustained when his coworkers physically had restrained him after he suffered a noncompensable seizure. The plaintiff claims that the board improperly concluded that his injuries resulting from the restraint were not compensable under the Workers' Compensation Act (act), General Statutes § 31-275 et seq., because they did not arise out of his employment. We agree with the plaintiff and reverse the board's decision.

The plaintiff filed a workers' compensation claim, which the commissioner dismissed. The plaintiff appealed to the board, which affirmed the commissioner's decision. This appeal followed.[1]

The commissioner found the following facts, which are undisputed. On February 13, 2002, the plaintiff suffered a grand mal seizure while he was at work for the named defendant, Platt Brothers and Company.[2] The seizure itself was not a compensable injury. As a result of the seizure, the plaintiff fell to the ground, uncon-

---

[1] The plaintiff appealed from the board's decision to the Appellate Court pursuant to General Statutes § 31-301b. We then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Wausau Insurance Company, the workers' compensation liability insurer for Platt Brothers and Company, also is a defendant in this action. For purposes of clarity, we refer to Platt Brothers and Company as the defendant.

scious, near a large steel scale in his workplace. As the plaintiff regained consciousness, he began flailing around, swinging his arms and kicking his legs. Mike Noel, a coworker, witnessed this incident and summoned two other coworkers, Bob Grenick, whom Noel referred to in his testimony as a paramedic, and Emo Bimmler, a factory foreman. The three men, in an attempt to prevent the plaintiff from injuring himself, as well as others, restrained the plaintiff. They held the plaintiff's arms down to the floor while the plaintiff attempted to break free from the restraint. As a result, the plaintiff suffered dislocations of both of his shoulders. The plaintiff initially sought treatment and ultimately surgery from Michael Sermer, an orthopedic surgeon. Sermer thereafter reported that he had concluded, on the basis of a reasonable medical certainty, that the plaintiff's shoulder dislocations were a result of the restraint, not the seizure.

The commissioner identified as the sole issue regarding the plaintiff's entitlement to workers' compensation benefits whether the plaintiff's injuries arose out of his employment. The commissioner made the following determinations based on his factual findings: (1) "The chain of causation which resulted in the [plaintiff's] shoulder injuries was set in motion by the [plaintiff's] grand mal seizure"; (2) "The seizure did not arise out of the [plaintiff's] employment"; and (3) "The [plaintiff's] injuries were caused by the intervention of other employees in his workplace who were trying to assist the [plaintiff]." In light of these determinations, the commissioner concluded that the injuries did not arise out of the plaintiff's employment and dismissed his claim for benefits.

The plaintiff then appealed from that decision to the board, which affirmed the commissioner's decision. The board noted the well established two-prong requirement of compensability—an injury arising out of and

in the course of employment—and further noted that the latter was undisputed, given that the plaintiff had suffered the seizure during work hours, while fulfilling his work duties. Turning to the disputed issue, the board noted that, for an injury to arise out of employment, the proximate cause of the injury must be set in motion by the employment, not some other agency. The board concluded that, because the plaintiff's original injury— the seizure—was not compensable, the resulting injury from his coworkers' application of first aid similarly was not compensable. The board analogized the present case to *Porter* v. *New Haven,* 105 Conn. 394, 397, 135 A. 293 (1926), wherein this court had concluded that a claimant's injury was not compensable when a visitor to the workplace had pushed the claimant, causing him to strike his head on a concrete floor. The board further concluded that the first aid was applied for the plaintiff's exclusive benefit and, accordingly, could not be deemed to arise out of his employment.

The plaintiff claims that the board improperly concluded that his injuries did not arise out of his employment. We agree with the plaintiff that his injuries arose out of his employment and, therefore, are compensable.

We begin by underscoring that the facts found by the commissioner were not contested by either party. Therefore, the issue before us is whether, given those undisputed facts, the board properly concluded that the plaintiff's injury did not arise out of his employment. As a general matter, "we have treated this issue [namely, whether the injury arose out of the employment] as factual in nature and, therefore, have accorded the commissioner's conclusion the same deference as that given to similar conclusions of a trial judge or jury on the issue of proximate cause. A finding of a fact of this character . . . is the finding of a primary fact. . . . This ordinarily . . . presents a question for the determination of the commissioner . . . ." (Internal quota-

tion marks omitted.) *Fair* v. *People's Savings Bank*, 207 Conn. 535, 541, 542 A.2d 1118 (1988); accord *Daubert* v. *Naugatuck*, 267 Conn. 583, 590, 840 A.2d 1152 (2004). Despite this highly deferential standard, however, "[t]he conclusions drawn by [the commissioner] from the facts found [will not] stand [if] they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Labadie* v. *Norwalk Rehabilitation Services, Inc.*, 274 Conn. 219, 227, 875 A.2d 485 (2005). Because in the present case the underlying facts are undisputed, and because both the commissioner and the board predicated their ultimate conclusions solely on the fact that the plaintiff's original fall was from a cause unrelated to the plaintiff's employment, the latter standard applies to this case. Thus, we review the board's decision on a de novo basis.[3]

In determining whether the commissioner properly applied the law to the subordinate facts, we begin with the following general principles. "It is an axiom of [workers'] compensation law that awards are determined by a two-part test. The [claimant] has the burden of proving that the injury claimed [1] arose out of the employment and [2] occurred in the course of the

_____

[3] The dissent incorrectly criticizes our application of de novo review in the present case. We do not question, however, the commissioner's findings of fact or inferences drawn therefrom, which, under the standard in *Fair*, would require application of a highly deferential standard of review. Rather, we address a question of law, which this court previously has not addressed, namely, whether an injury is compensable under the act when sustained as a result of coworkers rendering aid to prevent harm to other coworkers and the worker in distress. As we explain later in this opinion, the commissioner and the board proceeded from the erroneous legal premise that the plaintiff's idiopathic condition, which triggered the coworkers' response, was dispositive as to the question of whether the subsequent actions of the coworkers resulted in an injury that "arose out of the employment." We do not read *Fair* as requiring that we treat such questions as factual in nature.

employment. . . . The two part test is based on General Statutes § 31-275[4]. . . .

"An injury is said to arise out of the employment when (a) it occurs in the course of the employment and (b) is the result of a risk involved in the employment or incident to it or to the conditions under which it is required to be performed. . . . There must be a conjunction of [these] two requirements [of the test] . . . to permit compensation. . . . The former requirement [of arising out of the employment] relates to the origin and cause of the accident, while the latter requirement [of occurring in the course of employment] relates to the time, place and [circumstance] of the accident." (Citations omitted; internal quotation marks omitted.) Id., 227–28.

"An injury which occurs in the course of the employment will ordinarily [also] arise out of the employment; but not necessarily so, for the injury might occur out of an act or omission for the exclusive benefit of the employee, or of another than the master, while the employee is engaged in the course of his employment. . . . Speaking generally, an injury arises out of an employment when it occurs in the course of the employ-

---

[4] General Statutes § 31-275 provides in relevant part: "As used in this chapter, unless the context otherwise provides: (1) 'Arising out of and in the course of his employment' means an accidental injury happening to an employee or an occupational disease of an employee originating while the employee has been engaged in the line of the employee's duty in the business or affairs of the employer upon the employer's premises, or while engaged elsewhere upon the employer's business or affairs by the direction, express or implied, of the employer, provided . . .

"(B) A personal injury shall not be deemed to arise out of the employment unless causally traceable to the employment other than through weakened resistance or lowered vitality . . .

"(E) A personal injury shall not be deemed to arise out of the employment if the injury is sustained: (i) At the employee's place of abode, and (ii) while the employee is engaged in a preliminary act or acts in preparation for work unless such act or acts are undertaken at the express direction or request of the employer . . . ."

ment and as a proximate cause of it. [Therefore] [a]n injury which is a natural and necessary incident or consequence of the employment, though not foreseen or expected, arises out of it. . . . An injury of this description is one of the risks of the employment, for it is due to it and arises from it, either directly, or as incident to it, or to the conditions and exposure surrounding it. And the proximate cause of the injury is not necessarily that which immediately arises out of the employment, but may be that which is reasonably incidental to it." (Internal quotation marks omitted.) Id., 237–38.

In applying these general principles, we are mindful that the act "indisputably is a remedial statute that should be construed generously to accomplish its purpose." (Internal quotation marks omitted.) *Mello* v. *Big Y Foods, Inc.*, 265 Conn. 21, 25, 826 A.2d 1117 (2003). "The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation." (Internal quotation marks omitted.) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 41–42, 787 A.2d 541 (2002).

Turning to the present case, it is evident that the commissioner and the board began with a single proposition from which all other conclusions inexorably followed, namely, that, if the plaintiff's seizure was a noncompensable injury, any injuries causally connected thereto similarly must be noncompensable. This essential proposition, however, cannot be sustained.

"It long has been a fundamental tenet of workers' compensation law . . . that an employer takes the employee in the state of health in which it finds the employee." (Internal quotation marks omitted.) Id., 40. Thus, "an injury received in the course of the employment does not cease to be one arising out of the employment merely because some infirmity due to disease has

originally set in action the final and proximate cause of the injury. The employer of labor takes his workman as he finds him and compensation does not depend upon his freedom from liability to injury through a constitutional weakness or latent tendency. Whatever predisposing physical condition may exist, if the employment is the immediate occasion of the injury, it arises out of the employment because it develops within it." (Internal quotation marks omitted.) *Savage* v. *St. Aeden's Church*, 122 Conn. 343, 346–47, 189 A. 599 (1937); accord *McDonough* v. *Connecticut Bank & Trust Co.*, 204 Conn. 104, 112–13, 527 A.2d 664 (1987); *Gonier* v. *Chase Cos., Inc.*, 97 Conn. 46, 50–51, 115 A. 677 (1921).

Compensability also may not be denied simply because the plaintiff could have been exposed to a similar risk of injury from the administration of aid had he suffered the seizure outside of work. "[A]n injury may arise out of an employment although the risk of injury from that employment is no different in degree or kind [from that] to which [the employee] may be exposed outside of his employment. The injury is compensable, not because of the extent or particular character of the hazard, but because it exists as one of the conditions of the employment." (Internal quotation marks omitted.) *Triano* v. *United States Rubber Co.*, 144 Conn. 393, 397, 132 A.2d 570 (1957).

It is axiomatic, however, that "[t]he conditions of employment are not confined to those which the employer creates. . . . In determining whether the injury does result from the conditions of the employment, the normal reactions of men to those conditions are to be considered. . . . [Thus] the right of an employee to recover compensation is not nullified by the fact that his injury is augmented by natural human reactions to the danger or injury threatened or done. . . . The question is whether taking all the facts into

consideration the conditions of the employment are the legal cause of the injury." (Citations omitted; internal quotation marks omitted.) *Stulginski* v. *Waterbury Rolling Mills Co.*, 124 Conn. 355, 360–61, 199 A. 653 (1938). In assessing such natural human reactions, we have stated that, "[w]henever an employer puts his employees at work with fellow servants, the conditions actually existing—apart from the possibility of wilful assaults by a fellow servant independent of the employment—which result in injury to a fellow employee, are a basis for compensation under the implied contract of th[e] [a]ct." *Anderson* v. *Security Building Co.*, 100 Conn. 373, 377, 123 A. 843 (1924).

It seriously cannot be questioned that a risk exists in the workplace that an employee might fall stricken to the ground, thereby prompting the natural, foreseeable reaction of coworkers to render aid. With respect to the employer's liability for injuries arising from such actions, in his treatise, Professor Arthur Larson sets forth the general proposition that, "the scope of an employee's employment is impliedly extended in an emergency to include the performance of any act designed to save life or property in which the employer has an interest." 2 A. Larson & L. Larson, Workers' Compensation Law (2006) § 28.01 [1], p. 28-2. "The most common type of rescue case is the rescue of coemployees, and compensation is clearly payable for injuries so sustained, on the theory that the employer has a duty to aid its own employees in peril and that any employee is impliedly authorized to discharge this duty in an emergency." Id., p. 28-4. Courts have recognized under similar statutory schemes that, "[a] reasonable rescue attempt . . . may be one of the risks of employment, an incident of the service, foreseeable, if not foreseen, and so covered by the statute." (Internal quotation marks omitted.) *O'Leary* v. *Brown-Pacific-*

*Maxon, Inc.*, 340 U.S. 504, 507, 71 S. Ct. 470, 95 L. Ed. 483 (1951).[5]

Under these principles, it is clear that, had the plaintiff's coworkers themselves *sustained* injuries while tending to the plaintiff, their injuries would have been compensable. It would be anomalous, therefore, to conclude that injuries that these same coworkers, while acting in the course of their employment, *inflicted* on the plaintiff in attempting to prevent him from injuring himself and other workers would *not* be compensable. In other words, whether the rescue attempt at issue is characterized as a risk of, or a condition incident to, employment for those engaged in the conduct, the essential character of the act does not change when viewed from the perspective of the coworker injured by that same conduct. Cf. *Mascika* v. *Connecticut Tool & Engineering Co.*, 109 Conn. 473, 481, 147 A. 11 (1929) (Explaining, in a case in which the plaintiff, while on his way into work, was struck by a stick thrown by his coworkers who were engaging in horseplay: "So far as the plaintiff was concerned the legal situation was the same as if he had been struck while actually engaged in the operation of his press. The risk of being injured by reason of the skylarking of his fellow employees while he himself was a passive actor was one of the risks of his employment, being incident to the conditions under which his work was performed."). Indeed,

---

[5] In *O'Leary*, the court emphasized that the commissioner's conclusions that the claimant had acted reasonably in attempting the rescue and that his death fairly may be attributable to the risks of the employment were based on permissible, but not compelled, inferences from the evidence. *O'Leary* v. *Brown-Pacific-Maxon, Inc.*, supra, 340 U.S. 508. The rescue at issue in that case, however, was of a third person not employed by the defendant employer. Our survey of the case law in which an employee came to the aid of a coworker does not reveal any case in which a court concluded that the rescue was not a foreseeable risk or condition of the employment. To the extent that *O'Leary* suggests that the reasonableness of the rescue effort is a prerequisite to compensability, we note that, in the present case, the reasonableness of the efforts of the plaintiff's coworkers is not at issue.

this uniform treatment of the conduct and injuries arising therefrom is compelled in the present case, given that the commissioner found that the plaintiff's coworkers had acted to prevent injury both to the plaintiff, "*as well as others . . . .*"[6] (Emphasis added.)

We have recognized that, "[i]f the act is one for the benefit of the employer or for the mutual benefit of both an injury arising out of it will usually be compensable; on the other hand, if the act being performed is for the exclusive benefit of the employee so that it is a personal privilege or is one which the employer permits the employee to undertake for the benefit of some other person or for some cause apart from his own interests, an injury arising out of it will not be compensable." *Smith* v. *Seamless Rubber Co.*, 111 Conn. 365, 368–69, 150 A. 110 (1930).[7] Thus, when the action giving

[6] The dissent recognizes that there "may be cases where the provision of aid increases the risk of injury," and suggests that, consistent with case law from some other jurisdictions, such an injury could "arise out of the employment" if the aid were rendered negligently. Our statutory scheme, however, eschews any proof of fault or degree of culpability as a prerequisite for compensation. *Bergeson* v. *New London*, 269 Conn. 763, 768, 850 A.2d 184 (2004) ("[a]ct was enacted to provide compensation for any injury arising out of and in the course of employment, without regard to fault, by imposing a form of strict liability on the employer" [internal quotation marks omitted]). Thus, we disagree that the degree or presence of culpable conduct determines whether that conduct is a condition of employment.

[7] *Smith* v. *Seamless Rubber Co.*, supra, 111 Conn. 368–69, is instructive in that this court suggested therein that, when there is evidence of a mutual benefit from an employer's action in tendering medical aid to an employee, injury resulting from such aid would be compensable. In that case, the court affirmed the commissioner's decision that the plaintiff's infection resulting from a smallpox vaccination administered at his workplace did not arise from the plaintiff's employment. Id., 367. The court reasoned that, "if the act being performed is for the exclusive benefit of the employee so that it is a personal privilege or is one which the employer permits the employee to undertake for the benefit of some other person or for some cause apart from his own interests, an injury arising out of it will not be compensable." Id., 369. The court emphasized, however, that the record indicated that the sole purpose of the vaccination program was to serve "the general good of the community"; id., 370; and "nothing upon the record indicates the extent of the danger of an epidemic or how far it would be likely to affect working

rise to injury provides some benefit to the employer, the claimant need not prove the employer acquiesced to the action in order to establish compensability.[8] See *McNamara* v. *Hamden*, 176 Conn. 547, 553–54, 398 A.2d 1161 (1979) (concluding that meaning of activity deemed "incidental to" employment and hence compensable is not limited to "compulsion by or benefit to the employer" but also includes "customary activity sanctioned by the employer through approval or acquiescence" [internal quotation marks omitted]). Such acquiescence, or constructive knowledge, is implicit by virtue of the benefit. See *Kish* v. *Nursing & Home Care, Inc.*, 248 Conn. 379, 389–90 n.14, 727 A.2d 1253 (1999) (noting that, under our case law, constructive knowledge may be imputed as matter of law).

In light of the commissioner's finding that the plaintiff's coworkers had rendered aid to prevent injury not only to the plaintiff, but also to other workers, the *only* reasonable inference from this fact is that, contrary to

conditions in the company's factory." Id., 369. Thus, the court could not "assume as a necessary inference from the situation disclosed by the record that the opportunity given to the employees of the company to secure vaccination was extended to them for its benefit rather than as a personal privilege, or a means of serving the general good of the community. Lacking this fact the conclusions of the commissioner cannot be held to be violative of any rule of law, or unreasonable or illogical." Id., 369–70. In the present case, however, the necessary inference from the commissioner's finding that the plaintiff's coworkers intervened "in an attempt to prevent the [plaintiff] from injuring himself, as well as others" is that a mutual benefit inured to both the employer and the employee.

[8] The plaintiff contends that the defendant acquiesced in or sanctioned his coworkers' actions, ostensibly in reliance on his assertion that Grenick, "who also acted as the factory paramedic," had tendered the aid. Although, at the hearing before the commissioner, the defendant had conceded that Grenick was an emergency medical technician and Noel had testified that, "if anyone gets hurt at the company they usually go see [Grenick]," the commissioner only found as to this issue that "Noel referred to [Grenick] as a paramedic . . . ." The plaintiff did not seek to correct that finding. Therefore, we are limited to the record before us and do not consider Grenick's status as it otherwise might bear on compensability.

the board's conclusion, the coworkers' actions were undertaken to benefit both the plaintiff *and* the defendant. Given this mutual benefit, the injuries sustained as a result thereof must fall within the scope of the general rule that an injury sustained in the course of employment also arises out of the employment.[9] See *Labadie* v. *Norwalk Rehabilitation Services, Inc.*, supra, 274 Conn. 237 ("[a]n injury which occurs in the course of the employment will ordinarily [also] arise out of the employment; but not necessarily so, for the injury might occur out of an act or omission for the exclusive benefit of the employee, or of another than the master, while the employee is engaged in the course of his employment" [internal quotation marks omitted]); see also *Ryerson* v. *A. E. Bounty Co.*, 107 Conn. 370, 379, 140 A. 728 (1928) (plaintiff's action for his own safety, although ultimately causing injury, "was as important an act for the employer as for the employee, so that the master's work could be done" and thus gave rise to compensable injury).

Indeed, although it is not a prerequisite to compensability that the risk of injury be greater to the employee than to a member of the public; *Triano* v. *United States Rubber Co.*, supra, 144 Conn. 397; it cannot be questioned that the plaintiff was more likely to be physically restrained by his coworkers than by strangers had he suffered the seizure in some neutral, public forum. The incentive to act in the employer's interest, the community of purpose among coworkers and the relationships engendered by that purpose would make intervention, and hence injury therefrom, more likely.

This discussion demonstrates that the board's reliance on our decision in *Porter* v. *New Haven*, supra,

---

[9] To the extent that the dissent relies on Professor Larsen's framework designating risks as "neutral" or "personal" to assess compensability; see 1 A. Larson & L. Larson, supra, § 4.03, pp. 4-2 through 4-3; we note that this court has not heretofore adopted this framework, and we decline to do so in the present case.

105 Conn. 394, was misplaced. In *Porter*, a visitor to the claimant's workplace pushed the claimant, causing him to fall to the floor and sustain serious injury. Id., 395. The court emphasized that the actor in that case was not a coworker; id., 397; and it is self-evident that such an action could not be characterized as one benefiting the employer, or the employee for that matter.

The defendant contends, however, that public policy counsels against the compensability of the injury in the present case because such a result would have a chilling effect on coworkers and employers rendering aid to a stricken employee. We disagree that such a consequence is likely. Employers have a vested interest in the welfare of their employees and an even greater interest in preventing and minimizing compensable injuries. Employees witnessing a coworker in distress generally will not know whether the distress results from, or will lead to, a compensable or noncompensable injury. Moreover, it seems doubtful that an employer would risk possible liability for an employee's injuries that were sustained as a result of the employer's categorical bar on direct aid to an injured employee. Therefore, we conclude that the defendant's public policy argument is unpersuasive.

The decision of the board is reversed and the case is remanded to the board with direction to sustain the plaintiff's appeal.

In this opinion NORCOTT, KATZ, PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, C. J., with whom ZARELLA, J., joins, dissenting. The majority concludes that the injuries sustained by the plaintiff, Michael G. Blakeslee, Jr., when his coworkers attempted to assist him after he suffered an idiopathic seizure, arose in the course of his employ-

ment.[1] Accordingly, the majority concludes that the workers' compensation commissioner for the fifth district (commissioner) improperly dismissed the plaintiff's application for workers' compensation benefits. I disagree.

In *Fair* v. *People's Savings Bank*, 207 Conn. 535, 539–40, 542 A.2d 1118 (1988), this court stated that "[i]n determining whether a particular injury arose out of . . . employment, the [commissioner] must necessarily draw an inference from what he has found to be the basic facts. The propriety of that inference, of course, is vital to the validity of the order subsequently entered. But the scope of judicial review of that inference is sharply limited . . . . If supported by evidence and not inconsistent with the law, the [commissioner's] inference that an injury did or did not arise out of and in the course of employment is conclusive. No reviewing court can then set aside that inference because the opposite one is thought to be more reasonable; nor can the opposite inference be substituted by the court because of a belief that the one chosen by the [commissioner] is factually questionable." (Internal quotation marks omitted.) "It matters not that the basic facts from which the [commissioner] draws this inference are undisputed rather than controverted. . . . It is likewise immaterial that the facts permit the drawing of diverse inferences. The [commissioner] alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court." (Citation omitted; internal quotation marks omitted.) Id., 540.

Thus, the commissioner's findings of basic facts *and* his finding as to whether those facts support an infer-

---

[1] The defendants in this action are the plaintiff's employer, Platt Brothers and Company, and Wausau Insurance Company. For convenience, we refer to Platt Brothers and Company as the defendant.

ence that the plaintiff's injury arose from his employment are subject to a highly deferential standard of review. If any view of the evidence would support the commissioner's finding, then this court may not set aside that finding simply because it believes that another view is more reasonable.

The majority concludes that the question before us is not a factual question, subject to this highly deferential standard of review, but a legal question subject to plenary review. In support of this conclusion, it states that the commissioner and the workers' compensation review board (board) "predicated their ultimate conclusions solely on the fact that the plaintiff's original fall was from a cause unrelated to the plaintiff's employment," namely, his idiopathic medical condition. I agree that a ruling based solely on the application of that incorrect legal principle to the undisputed facts of this case would be subject to plenary review. I do not believe, however, that the majority accurately characterizes either the commissioner's holding or the board's holding. The commissioner's decision was based on its findings *both* that the causal chain resulting in the injury was "set in motion by the [plaintiff's] grand mal seizure" *and* that the injuries "were caused by intervention of other employees in his workplace who were trying to assist the [plaintiff]." Similarly, the board recognized that an injury arising from an idiopathic medical condition may be compensable in some cases, but only if the injury was the result of a condition of employment. The legal question before the court, therefore, is whether an injury is compensable under the Workers' Compensation Act (act), General Statutes § 31-275 et seq., when the initial cause of the injury was an idiopathic medical condition *and* the injury resulted from the efforts of the plaintiff's fellow employees to assist him. For reasons I discuss later in this dissenting opinion, I would conclude that, as a general rule, the answer to that question

is no. I would also conclude that the evidence amply supports that conclusion in the present case.

After setting forth the standard of review, the majority makes the following observations: first, that an employer takes an employee in the state of health in which it finds him; second, that an injury may arise out of employment although the risk of injury from that employment is no different in degree from that to which the employee may be exposed outside of his employment; third, that an employee's right to recover compensation is not nullified because his injury was augmented by natural human reactions to a dangerous or injurious employment condition; and, fourth, that if an employee is injured while rescuing a fellow employee in peril, his injuries are compensable. Relying on these principles, the majority states that "[i]t would be anomalous . . . to conclude that injuries . . . *inflicted* on the plaintiff in attempting to prevent him from injuring himself and other workers would *not* be compensable." (Emphasis in original.) The majority reasons that, "whether the rescue attempt at issue is characterized as a risk of, or a condition incident to, employment for those engaged in the conduct, the essential character of the act does not change when viewed from the perspective of the coworker injured by that same conduct."

Upon closer examination, however, none of the general principles relied on by the majority supports its conclusion. The majority relies on *Savage* v. *St. Aeden's Church*, 122 Conn. 343, 346–47, 189 A. 599 (1937), for the proposition that an employer takes the employee in the state of health in which it finds him. This court stated in *Savage* that, "[w]hatever predisposing physical condition may exist, if the employment is the immediate occasion of the injury, it arises out of the employment because it develops within it." (Internal quotation marks omitted.) Id., 347. We also stated, however, that "[a]n injury arises out of an employment when it occurs

in the course of the employment and *is the result of a risk involved in the employment or incidental to it . . . ."*[2] (Emphasis added; internal quotation marks omitted.) Id., 345. The majority also points out that an "injury is compensable, not because of the extent or particular character of the hazard, but because it exists as one of the conditions of the employment." (Internal quotation marks omitted.) *Triano* v. *United States Rubber Co.*, 144 Conn. 393, 397, 132 A.2d 570 (1957). This language merely indicates, however, that, although there is no requirement that an employment-related risk be extraordinary or exclusive to the workplace, there must be an employment-related risk. Finally, the majority points out that "the right of an employee to recover compensation is not nullified by the fact that his injury is augmented by natural human reactions to the danger or injury threatened or done." (Internal quotation marks omitted.) *Stulginski* v. *Waterbury Rolling Mills Co.*, 124 Conn. 355, 361, 199 A. 653 (1938). We also stated in *Stulginski*, however, that the claimant must prove that *"the conditions of the employment* are the legal cause of the injury." (Emphasis added.) Id.

Thus, all of these cases cited by the majority merely hold that, if an injury is the result of a risk of employment, it is compensable. They also hold that certain circumstances and conditions are not disqualifying if the injury is the result of a risk of employment. None of the cases, however, attempts to define what constitutes a risk of employment with respect to an idiopathic medical condition. The majority simply begs that question when it concludes that an employer's provision of assistance to an employee suffering from an idiopathic medical condition is a risk of employment because public policy and employment relationships make the provi-

---

[2] I would also note that the discussion in *Savage* relating to preexisting medical conditions may be characterized as dicta. See footnote 3 of this opinion.

sion of such aid desirable and likely. For reasons that I discuss later in this dissenting opinion, I would conclude that, when the initial cause of an injury is an idiopathic medical condition, a "risk of employment" is an employment condition that increases the likelihood of injury from the medical condition.

Moreover, I do not agree that characterizing workplace conduct as a condition of employment depending on the perspective of the person making the claim creates anomalies. For example, the fact that a worker injured by a stick thrown by another worker may receive compensation because horseplay is a condition of employment; see *Mascika* v. *Connecticut Tool & Engineering Co.*, 109 Conn. 473, 481, 147 A. 11 (1929); does not logically imply that a worker who injures his back throwing a stick at another worker would be compensated. Similarly, the fact that an employee who is injured by an fellow employee who is insane may receive compensation because the risk that a fellow employee will become insane is a condition of employment; see *Anderson* v. *Security Building Co.*, 100 Conn. 373, 377, 123 A. 843 (1924); does not necessarily mean that an employee who injures himself after becoming insane would be compensated. Indeed, under the majority's reasoning, if an employee who held a grudge against a coworker wildly fired a gun at the coworker in the workplace, and was injured when fellow employees restrained him in an effort to protect the coworker and themselves, the fact that they were attempting to save lives in which the employer had an interest would mean that the injuries were compensable. In my view, *that* result would be anomalous. Accordingly, I do not believe that denying compensation to the plaintiff in the present case while granting compensation to coworkers injured while coming to his rescue would be inherently inconsistent or inconsistent with the general principles cited by the majority.

Finally, the majority concludes that "[i]n light of the commissioner's finding that the plaintiff's coworkers had rendered aid to prevent injury not only to the plaintiff, but also to other workers, the *only* reasonable inference from this fact is that, contrary to the [compensation review] board's conclusion, the coworkers' actions were undertaken to benefit both the plaintiff *and* the defendant." (Emphasis in original.) The board's finding that the plaintiff's injuries did not arise in the course of employment was not, however, based *solely* on a finding that the aid that the plaintiff received was for his benefit alone. Rather, the board concluded that the injuries were not compensable in part because they arose from an idiopathic medical condition. That conclusion was consistent with the commissioner's rejection of the plaintiff's claim on the *sole* ground that "[t]he chain of causation which resulted in the [plaintiff's] shoulder injuries was set in motion by the [plaintiff's] grand mal seizure." Thus, the board's finding that the provision of the aid was for the sole benefit of the plaintiff was essentially an alternate ground for affirming the commissioner's ruling. Accordingly, even if that finding was not supported by the evidence, it would not be fatal to the defendant's claim. As I have indicated, the fact that an employer indirectly benefits from restraining an employee does not necessarily mean that injuries suffered by the employee as a result of the restraint are compensable.

In summary, I believe that the relevant case law does not support the majority's conclusion that an employer's provision of aid to an employee suffering from an idiopathic medical condition is an inherent risk of employment; its conclusion that the essential character of an employee's act as a condition of employment "does not change when viewed from the perspective of the coworker injured by that same conduct" finds no basis in law or in logic; and its determination that

the aid provided to the plaintiff in the present case did not solely benefit the plaintiff is irrelevant to the question before us. Accordingly, I am entirely unpersuaded by its analysis. Instead, I would conclude that Larson's distinction between personal risks and neutral risks; see 1 A. Larson & L. Larson, Workers' Compensation Law (2006) § 4.03, pp. 4-2 through 4-3; provides the proper analytical framework for resolving the question of whether the plaintiff's injuries arose from his employment. Larson defines neutral risks as workplace conditions that arise neither from a specific employment activity nor from a characteristic personal to the employee. Id. Such risks include employee horseplay in which the injured employee has not participated or an attack by a fellow employee who has lapsed into insanity. See id. When an injury arises from a neutral risk, "all that is needed to tip the scales in the direction of employment connection . . . is the fact that the employment brought the employee to the place at the time he or she was injured—an extremely lightweight causal factor, but enough to tip scales that are otherwise perfectly evenly balanced." Id., § 9.01 [4] [b], p. 9-8. In other words, the employer assumes the risk of injury from dangerous conditions that may arise at the place of work and that are not personal to, caused by or within the control of the employee, even when, as in the horseplay cases, the workplace condition is not specifically employment-related.

Larson describes risks that attach to a particular employee and that have no connection to the employment, such as an employee's own idiopathic medical condition or animus between employees, as personal risks. Id., § 4.02, p. 4-2. When an injury's initial causative factor is a personal risk, a stronger causal connection between the ultimate injury and the employment than mere presence at the place of work and exposure to general workplace conditions is required to establish

compensability. See id., § 9.01 [4] [b], p. 9-8 ("[t]o shift the loss in the idiopathic-fall cases to the employment . . . it is reasonable to require a showing of at least some substantial employment contribution to the harm"). In cases in which a fall on a level floor was triggered by the injured employee's idiopathic medical condition, for example, the presence of the employee at the site of employment *plus* the unusual hardness of the floor may be required to constitute a sufficient causal connection.[3] See id., § 9.01 [4] [e], p. 9-14. If the

[3] The plaintiff in the present case points out that the decedent in *Savage* v. *St. Aeden's Church*, supra, 122 Conn. 345–50, had an idiopathic medical condition and that this court did not require any showing of a causative link between the injury and the employment beyond his presence at the workplace at the time of injury. He also points out that Larson's treatise states that this court in *Savage* "chose . . . to adopt the more ambitious doctrine that a fall caused by personal disease is compensable even if the risk of harm as a result of falling is no greater at the place of employment than anywhere else." 1 A. Larson & L. Larson, supra, § 9.01D [4] [a], p. D9-17. Larson's treatise also states, however, that our decision in *Savage* "is weakened by the fact that the level-fall holding was not necessary to the decision. Most of the opinion partakes of the nature of dictum, since the commission's finding was that the cause of the deceased's fall was unknown. [The] [d]eceased was a painter who was found dead with a fractured skull on a concrete floor during working hours, no one having seen him fall. There was also a finding that [the] claimant had a history of heart murmur, but no finding connecting this with the fall." Id. In light of the facts that the decedent in *Savage* fell to a hard concrete floor and that there was no finding as to the cause of the fall, I do not believe that our holding in that case established a rule that the mere fact that the injury occurred at the place of employment establishes a causal connection between the injury and the employment in personal risk cases.

In this regard, it may be useful to quote Larson's treatise in full. "It should be stressed that [the] requirement of some employment contribution to the risk in idiopathic-fall injuries is a quite different matter from the requirement of increased risk in, say, lightning cases. The idiopathic-fall cases begin as personal-risk cases. There is therefore ample reason to assign the resulting loss to the employee personally. The lightning cases begin as neutral-risk cases. There is therefore no reason whatever to assign the resulting loss to the employee personally. To shift the loss in the idiopathic-fall cases to the employment, then, it is reasonable to require a showing of at least some substantial employment contribution to the harm. But in the neutral-risk cases, the question is not one of shifting the loss away from a prima facie assignment to the employee at all, since there has never been ground for

conditions of employment reduce or do not increase the likelihood of injury from an idiopathic medical condition, any resulting injury should not be compensable. For example, if an employee were injured even though he fell on a thick carpet or an "8-inch-thick, deluxe, innerspring mattress"; id., § 9.01 [4] [c], p. 9-11; Larson would find no causal connection between the injury and the employment.[4] Id., pp. 9-11 through 9-12.

The dispositive question before this court, therefore, is whether the policy of providing aid to an employee who is stricken in the workplace as the result of an idiopathic medical condition increases the risk of injury from such a condition. In my view, it clearly does not. Obviously, the very purpose of providing such aid is to *reduce* the risk of injury. Common sense and experience inform us that, as a general rule, that purpose is fulfilled in the act. The majority concludes, however, that "[t]he incentive to act in the employer's interest, the community of purpose among coworkers and the relationships engendered by that purpose would make intervention, and hence injury therefrom, more likely." This conclusion turns the world topsy-turvy. If the provision of aid to a stricken employee makes injury more likely, then

any such assignment. All that is needed to tip the scales in the direction of employment connection, under the positional-risk theory, is the fact that the employment brought the employee to the place at the time he or she was injured—an extremely lightweight causal factor, but enough to tip scales that are otherwise perfectly evenly balanced.

"The idiopathic-fall cases in this respect can be closely analogized to the cases of privately motivated assaults. In both instances, the central causal factor is personal—intensely and conspicuously personal—whether it is a diseased heart, or a personal enemy who is determined to shoot the employee wherever and whenever he can find that employee." Id., § 9.01 [4] [b], p. 9-8.

[4] The distinction between neutral risks and personal risks makes sense of the apparent "anomalies" referred to by the majority. Injuries incurred by an employee while rescuing a fellow employee are compensable because the risk of such injuries is not personal to the employee, but is at least a neutral risk and possibly an employment-related risk. On the other hand, injuries incurred by the rescued employee are not compensable because the employee carried the risk into the workplace with his person.

there would be no rational basis for the rule cited by the majority that "the employer has a duty to aid its own employees in peril and . . . any employee is impliedly authorized to discharge this duty . . . ."

Of course, if an employer has trained its employees to provide cardiac massage to fellow employees who are having a heart attack, then an employee might be more likely to suffer cracked ribs as a result of the procedure if he had a heart attack at work than if he had a heart attack on the street, where it is less likely that he would receive any care at all. The employee also might be more likely, however, to survive a heart attack at work. If the heart attack itself was a noncompensable idiopathic injury, I see no reason why the cracked ribs should be compensable.

I recognize that there may be cases where the provision of aid increases the risk of injury. Several courts have held, for example, that when employees provide aid to a stricken fellow employee in a negligent manner, resulting injuries are compensable. See *Winn* v. *Geo. A. Hormel & Co.*, 252 Neb. 29, 38–39, 560 N.W.2d 143 (1997); *Dudley* v. *Victor Lynn Lines, Inc.*, 32 N.J. 479, 494–95, 161 A.2d 479 (1960); *Lanier* v. *Kieckhefer-Eddy Division of Weyerhaeuser Timber Co.*, 84 N.J. Super. 282, 288, 201 A.2d 750 (1964); *Vanderbilt University* v. *Russell*, 556 S.W.2d 230 (Tenn. 1977); cf. *Panaro* v. *Electrolux Corp.*, 208 Conn. 589, 590–93, 545 A.2d 1086 (1988) (when employee had idiopathic medical condition and suffered injury as result of negligent medical care rendered by fellow employee, workers' compensation claim was exclusive remedy).[5] Nothing in the

---

[5] I recognize that these courts make "compensation depend on proof of fault, in the face of the [workers' compensation] statute's direction that compensation be awarded or withheld without regard to the negligence of the employer." (Internal quotation marks omitted.) *Dudley* v. *Victor Lynn Lines, Inc.*, supra, 32 N.J. 495; see also *Spatafore* v. *Yale University*, 239 Conn. 408, 417, 684 A.2d 1155 (1996) (purpose of act is to compensate employees for injuries without finding of fault by imposing strict liability on employers). As the court in *Dudley* recognized, however, "it is only the

record before us, however, suggests that the plaintiff's coworkers were negligent in providing assistance or that the plaintiff would have been less likely to suffer injury if no aid had been provided.[6] Nor does the record establish that the plaintiff would have avoided injury if he had suffered the seizure outside the workplace.

The majority states that "this court has not heretofore adopted [Larson's] framework, and we decline to do so in the present case." The majority simply ignores the fact that, in creating this framework, Larson was not merely proposing one alternative view of the worker's compensation scheme, but was making an essential attempt to discern the principles inherent in a large body of apparently inconsistent case law—including our own—dealing with idiopathic medical conditions. Larson recognized that the application of those principles to specific cases may be difficult and may require compensation commissioners and courts to make very fine, and sometimes painful, distinctions. See 1 A. Larson & L. Larson, supra, § 9.01 [4] [c], pp. 9-11 through

alleged negligence that makes the death [or injury] one 'arising out of' the employment. If that negligence was not present, neither would there be a work connection, for the risk to which [the plaintiff's decedent's] employment exposed him, and which allegedly eventuated in his death, was the risk of failure of aid that the law demands." *Dudley* v. *Victor Lynn Lines, Inc.*, supra, 495. Moreover, because an employee who rescues a fellow employee is furthering his employer's interest, it violates the exclusivity provisions of the act to allow an injured employee to sue a fellow employee for negligence during the course of the rescue. See *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 601–602. It would be inconsistent, unfair and contrary to the remedial purpose of the act to bar an employee, under the exclusivity provisions of the act, from suing a fellow employee for negligence and, at the same time, to bar the employee, under the "arising from employment" provision, from receiving compensation for negligently inflicted injuries.

[6] The majority may complain that the plaintiff could not have known that he was required to establish negligence on the part of his coworkers in order for his injuries to be compensable. If that is the case, then fairness might require a remand to the commissioner for the purpose of allowing the plaintiff to make such a showing.

9-12.[7] He also recognized, however, that the failure to make those critical distinctions will undermine the very purpose of the act. See id. Although the majority rejects Larsen's impressive attempt to make sense of the body

[7] Larson writes: "Granting that it is difficult to distinguish between a fall from a low height and a fall from no height—once it is decided to compensate idiopathic, level-floor falls, how is the basic principle which connects such an injury with the employment to be phrased? This entire line of cases is based on one simple theory: Although the cause of the fall was originally a personal one, employment conditions contributed some hazard that led to the final injury. This theory can be stretched to the breaking point, as it indeed has by the evolution already sketched out; but having reached that point by virtue of this theory, one then cannot throw away the entire test because it is painful to have to draw the final line, and because the stretching of the test has made it difficult to defend the ultimate distinctions that must be made.

"Let us assume, for the sake of argument, that an epileptic employee suffers a seizure in the office of a senior partner of a law firm, on a 2-inch-thick carpet, and falls and breaks an arm. It will, of course, be argued that there is no valid distinction between falling on a bare floor and falling on a carpeted floor; and the jurisdictions that have employed the kind of reasoning quoted above may feel constrained to make this additional extension. But then suppose the employee, employed in a mattress factory, falls directly onto an 8-inch-thick, deluxe, innerspring mattress, and still breaks an arm. Can one distinguish a 2-inch rug and an 8-inch mattress, if in any case the employee ends with a broken arm?

"This is the kind of result one ends with if cases are decided solely by measuring how small the distance is to the last precedent, without checking the result against the underlying principle on which the whole field of law rests. In this last example the employment not only does not contribute a hazard—it clearly reduces it below what it would be in almost any conceivable nonemployment setting. Therefore, if a general statement of the rule applied should ever be attempted, it would have to be this: When an employee falls, solely because of an internal disease or weakness, the effects of the fall arise out of the employment even if the conditions of employment reduce the hazards of such a fall below what they would otherwise be. This, of course, few courts would be willing to say; but several have already in effect said that the effects of such a fall arise out of the employment even if the conditions of employment add nothing to the hazards that would otherwise be encountered.

"The fallacy in the quoted reasoning above, which permits the reductio ad absurdam just mentioned, lies in the failure to realize that, while most of the qualities, virtues, and faults of daily life vary by infinitesimal degrees, rules of law must, by their very nature, proceed by categories. Lines must be drawn, on either side of which occur situations that seem so similar that to attach widely different consequences to them may seem ridiculous and cruel." 1 A. Larson & L. Larson, supra, § 9.01 [4] [c], pp. 9-11 through 9-12.

of workers' compensation law dealing with idiopathic medical conditions, it makes no such attempt itself. Instead, the majority engages in precisely the same reductio ad absurdam criticized by Larson when it fails to apply "the underlying principle on which the whole field of law rests"; id., p. 9-11; in order to draw the critical line between cases in which a preexisting idiopathic medical condition does not preclude compensation because the injury is the result of a risk of employment, and cases in which the injury is noncompensable because it occurs "even [though] the conditions of employment reduce the hazards of such a [condition] below what they would otherwise be." Id., pp. 9-11 through 9-12.

Because the record in the present case establishes unequivocally that the initial causal factor of the plaintiff's injuries was an idiopathic medical condition, and because there is no evidence that his coworkers' provision of assistance increased the risk of injury from that condition, I would conclude that the evidence amply supports the commissioner's finding that the injuries did not arise out of employment. Accordingly, I would conclude that the commissioner properly dismissed the plaintiff's application for workers' compensation benefits.